Ben VERASTIQUE, Appellant,

v.

TERRACE ASSOCIATES, LTD., Appellee.

No. 11348.

Court of Civil Appeals of Texas.
Austin.

Jan. 5, 1966.

Rehearing Denied Jan. 26, 1966.

Sneed & Vine, J. P. Darrouzet, Houghton Brownlee, Jr., Austin, for appellant.

McGinnis, Lochridge, Kilgore, Hunter & Wilson, Lloyd Lochridge, David Franklin, Austin, for appellee.

HUGHES, Justice.

Ben Verastique, appellant, sued Terrace Associates, Ltd., appellee, on a sworn account totaling $4,182.29, for attorney's fees and costs, alleging that the account sued on was for fruits and vegetables furnished the Terrace Motor Hotel in Austin, Texas, which motel "has been operated as such by Austin Terrace, Inc., a corporation now in bankruptcy, for the benefit of and under a contract with" appellee, and that appellee, by reason of such contract was liable for such account, and that Austin Terrace, Inc. was the alter ego of appellee.

Trial was non-jury. Judgment was rendered that appellant take nothing by his suit.

The case was tried upon stipulations. The relevant facts are:

On or about May 1st, 1958, appellee owned Terrace Motor Hotel, Terrace Motor Hotel Coffee Shop No. 1, Terrace Motor Hotel Restaurant No. 2 and certain other property which was subject to a lease by appellee to Newmark & Co., a New York Partnership.

Simultaneously, to-wit: on May 1st, 1958, Newmark & Co. assigned this lease to the Sherator Corporation, which is also known as the Sheraton Austin Corporation, which, in 1959, assigned the lease to Austin Newmark, Inc. (its name was changed to Austin Terrace, Inc. September 24, 1963), who held the same as a tenant from 1959 until the corporation took bankruptcy on March 17, 1964.

Newmark & Co., a New York Partnership, was composed of Aaron Gural, Jerry S. Handler, Jack Shenker, R. Siegal and Leonard S. Abrams up to February 1, 1964, when Abrams dropped out, and is a real estate organization which buys and sells and manages real estate and which has been in business for about 20 years. The office of this partnership is located at 1440 Broadway, New York, New York. The percentages of ownership in Newmark & Co. and in Austin Terrace, Inc., as of 1959, were as follows:

|  | Newmark & Co. | Austin Terrace Inc. |
| --- | --- | --- |
| Aaron Gural | 30% | 28% |
| Jack Shenker | 30% | 28% |
| R. Siegal | 15% | 14% |
| Jerry S. Handler | 12% | 20% |
| Leonard S. Abrams | 13% | 10% |
|  | 100% | 100% |

Both appellee and Austin Terrace, Inc. have addresses at 1440 Broadway, New York City, New York.

The exact number of shares in Austin Terrace, Inc. is not reflected in the record, however, there is shown in a claim by Newmark & Co. in account with Austin Terrace, Inc. an item in the amount of $2,500.00 for the capital stock, this item being dated September 30, 1959.

Austin Terrace, Inc., (formerly Austin Newmark, Inc.) was organized to take over the lease from Sheraton Corporation. This was accomplished in July of 1959 and the take-over of the lease from the Sheraton Corporation was primarily discussed and arranged by the then partners of Newmark & Co., who became the only stockholders of Austin Terrace, Inc.

By the year 1961, the liabilities of Austin Terrace, Inc. had exceeded its assets according to the testimony of its own bookkeeper. In the year 1961 the excess was close to $300,000.00 of the liabilities over assets. By the year 1964 the excess of liabilities over assets was approximately one-half million dollars. This condition was brought about by everyday operating expense and because of money that was due to Newmark & Co., money which had been advanced for the operation of Austin Terrace, Inc. Newmark & Co. had guaranteed a note of Austin Terrace, Inc. in the amount of $40,000.00 prior to the time Austin Terrace, Inc. became bankrupt, of which $16,500.66 has been paid by Newmark & Co.

At all times pertinent to this lawsuit, appellant sold to Austin Terrace, Inc. the items at the prices sued for in this lawsuit.

Appellee, Terrace Associates, Ltd., is a limited partnership doing business in Texas.

No owner, or partner, of appellee, Terrace Associates, Ltd., owned any stock in Austin Terrace, Inc., or any interest in Newmark & Co. These latter two companies were completely owned by the persons and in the proportions shown above. None of these persons owned any interest in appellee, Terrace Associates, Ltd.

Appellant has one point of error which is that since the record shows that Austin Terrace, Inc. was indebted to him and that it was the alter ego or agent of appellee that appellee was liable for such debt.

It is our opinion that there is no factual basis to support appellant's point. There is no evidence that Austin Terrace, Inc., was the agent or alter ego of appellee.

The only connection between appellee and Austin Terrace, Inc. and the other associations named above was the lease executed by appellee with Newmark & Co. It was stipulated that appellee "had no agreement, verbal or written, with Newmark & Co. or Austin Terrace, Inc. with respect to the Terrace Motor Hotel * * * other than the lease contract. * * * received no payments either directly or indirectly on account of the operation of Terrace Motor Hotel other than rental paid under the lease * * * at no time had any salaried employee connected with the operations of the Terrace Motor Hotel * * *"

In addition, as shown supra, none of the general or limited partners of appellee owned any interest in Newmark & Co., Austin Newmark, Inc. or Austin Terrace, Inc. at any time.

Since the lease executed by appellee is the only link connecting it with Austin Terrace, Inc., we must examine it to determine whether it creates a relationship of agency between the parties or that of landlord and tenant. Appellant gives us little assistance in analyzing the lease, saying merely that, "This lease covers just about every conceivable contingency that could occur. We shall not go into the lease in detail, but simply note to the Court that on page three of the lease and page four along with other cross paragraphs, the lease admits of no other use than that of a first rate motel, and so limits the lessee that he can do nothing else except run a first class motel, and he is even limited in doing that."

We have examined the lease in question and find it comprehensive, very comprehensive. Most of its provisions relate, however, not to the use of the property by the lessee, but to the protection of the landlord in the collection of his net annual rental of $330,-000.00 and in the preservation of the property. Most every contingency in these matters seems to have been anticipated and provided for. These provisions, for the most part, are not activated until there is default by the lessee or the property suffers loss or damage. The provisions of the lease respecting the use of the property by the lessee are:

"Tenant covenants and agrees that it will use said premises only for the purpose of conducting therein and thereon a motel, restaurant and suitable associated retail business and for no other purpose, and Tenant further agrees to operate the said motel and restaurant in keeping with acceptable standards of a first-class operation of similar character. Nothing in the foregoing sentence shall prohibit Tenant from operating on the premises a private membership organization. Tenant will not use or suffer said premises to be used for any disorderly, immoral or unlawful purposes and will not suffer or commit any waste to, in, or upon said building, furniture, furnishings, fixtures, roadways and premises in general.

3. A. Tenant covenants and agrees to maintain the amount and quality of the chattels, furniture, furnishings and equipment now used and installed in said motel, in a first-class, clean and sanitary condition, making such repairs and replacements as may be necessary and proper to maintain the character and quality of the chattels, furnishings, fixtures and equipment appropriate for the operation of a high-class motel. In performance of its obligation hereunder, Tenant shall have the right to dispose of such chattels, furnishings, furniture and equipment from time to time during the term hereof or any renewal term provided that it shall

replace same with items of at least equal quality and utility.

B. Tenant shall maintain high standards of service, cleanliness and quality. During the term hereof, the motel, together with all departments thereof, shall be kept open to the public at all times which the Tenant shall reasonably determine, and be managed and conducted in a first class and proper manner.

C. The Tenant will at all times comply with all laws, ordinances and regulations in the operation of said motel, and at no time will the Tenant do or perform, or with knowledge suffer or permit to be done or performed, any act of omission or commission which will cause or suffer the operation of said motel to be abated or interfered with. Landlord represents that the building and improvements thereon will, at the commencement of the term hereof, comply with all such laws, ordinances and regulations.

\* \* \* \* \* \*

The Tenant upon performing and observing the covenants and conditions herein on the part of the Tenant to be performed shall quietly and peaceably hold and enjoy the leased premises during the term of this agreement of lease, subject to the terms of said lease.

\* \* \* \* \* \*

Notwithstanding anything to the contrary herein contained, the Tenant shall not and will not use the demised premises for any unlawful purpose or any purpose not in compliance with the zoning ordinances and/or building regulations adopted by any governmental authority having control of the type of use to which the premises may be put and any certificate of occupancy relating to the demised premises, and the Tenant shall throughout the term of this lease, and any extension term, execute and comply with, at its own cost and expense, all laws, rules, orders, ordinances, notices and regulations at any time issued or in force which may be applicable to the demised premises or the occupation thereof, of any governmental authority having jurisdiction thereof, together with every department, bureau and official thereof, and of the Board of Fire Underwriters or similar body in the locality. It is the intention of the parties hereto that the Tenant shall, will and hereby does assume full and entire responsibility, in connection with the demised premises."

We do not find these provisions, or any or all of the provisions in the lease, sufficient, as a matter of law, to create the relationship of master and servant between the parties thereto. There was no attempt, as we view it, on the part of lessor to control lessee in the details of the operation of the motel. The rent was a fixed rent. It did not depend upon the income from the property. The lessee could charge the public for the use of the premises and for his services what he pleased. He could do business with whom he pleased.

The limitations upon the use of the demised property were general in nature and of a character not uncommon in leases of commercial property. Certainly, it is not unusual for landlords to restrict the use of the property to a certain type of business, or to provide that such business shall be conducted in a first class manner, consistent with law and morality.

We find nothing in the record to indicate that this lease was a subterfuge or that it is anything except what it purports to be. In our opinion, it created the relationship of landlord and tenant between the parties, and nothing more.

We overrule appellant's point and affirm the judgment of the trial court.